[Crim. No. 6625.   Second Dist., Div. Three.   Dec. 17, 1959.]

## THE PEOPLE, Respondent, v. EDWIN KIRLEY HARRISON et al., Appellants.

Ellery E. Cuff, Public Defender (Los Angeles), Erling J. Hovden, Chief Deputy Public Defender, Richard B. Goethals, Former Deputy Public Defender, Richard W. Erskine, Deputy Public Defender, and Lloyd C. Griffith for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

VALLÉE, J.—By information defendants were charged in count I with attempted robbery of Lewis Williams, in count II with attempted robbery of Elijah Jones, and in count III with the murder of Lewis Williams. It was alleged in counts I and II that defendants were armed with a .38-caliber revolver. In a nonjury trial the defendants were found guilty as charged in each count and the allegations of being armed were found to be true. The attempted robberies were adjudged to be of the first degree. The penalty as to count III was fixed at life imprisonment as to each defendant.

On February 25, 1958, Elijah Jones was working in a cleaning establishment owned by Lewis Williams at 2111 East 92nd Street, Los Angeles. Williams was in the shop. Jones was sitting behind the counter in front of the cash register. Williams was sitting nearby at a sewing machine, also behind the counter. Defendants Harrison and Blackshear entered the shop. One of them was carrying some trousers. Williams walked up to the counter near the front door and asked, "What can I do for you?" One of the men said, "How much you charge me to clean these two pair of pants?" Williams replied, "60 cents a pair." Jones, whose back had been turned, heard "a lump; a noise," looked around, and saw Harrison behind the counter between himself and Williams with a gun in his hand. At that instant Harrison commenced firing at Jones. Jones was hit once in the arm. When Harrison commenced firing, Jones immediately reached behind the cash register and grabbed Williams' gun. He turned and fired at Harrison, emptying the gun. During this time Jones received three more wounds from the gun fired by Harrison. At that point Blackshear went back of the counter, grabbed Harrison, saying "Come on, man, you're shot," and took him out of the shop. Jones then noticed that Williams was lying on the floor at the end of the counter. Defendant Asberry waited on the street in an automobile to provide a means of escape.

Williams died a week later of a wound received during the encounter. Death was caused by acute septicemia due to a perforating wound of the abdomen with multiple visceral injuries. The bullet that inflicted the fatal wound was fired from the gun used by Jones.

No point is made with respect to the convictions of attempted robbery.

The question, as stated by defendants, is this: "Where a victim of an attempted robbery shoots at one of the three

robbers, either in self-defense or in an attempt to frustrate the robbery, and inadvertently kills the other intended victim of the robbery, are the three robbers guilty of murder in the first degree?''

"Murder is the unlawful killing of a human being, with malice aforethought." (Pen. Code, § 187.) Counsel say: "Is it a murder under Section 187? And, is the felon responsible for a killing committed by another which killing is justifiable or excusable on the part of the person actually doing the killing? If a killing falls outside of Section 187, in that it is not an unlawful killing on the part of the actor, then we should not attribute this lawful act to someone else and make it unlawful. . . . If a killing occurs during the commission of a felony the cases clearly hold that the malice aforethought to make it murder is implied, but this is only (with the exception of certain Pennsylvania cases) if the act was the act of one of the felons."

Penal Code, section 189, provides that murder which is committed in the perpetration or attempt to perpetrate robbery is murder of the first degree—the felony-murder rule. "Perpetrate" means "To do or perform; to carry through; to commit (as an offense); to be guilty of; . . . as to *perpetrate* a crime." "Perpetration" means "Act of perpetrating; a doing, esp. of something bad morally . . .; an offensive action." (Webster's New Inter. Dict.) Counsel say: "Thus, we find that the killing is really not 'committed in the perpetration of' the robbery, but rather in an act to defeat and frustrate the robbery. We thus submit that the killing in this case does not come within the definition set forth in Penal Code Sections 187 and 189."

We have not been cited to, nor have we found, a California case which deals squarely with the question of criminal liability for a homicide occurring in the commission of, or attempt to commit, a felony where the fatal injury is inflicted by one not a participant in the felony.

The courts in other jurisdictions have reached different conclusions on the question of criminal liability. One line of decisions, proceeding on the theory that the doctrine of proximate cause is applicable in criminal prosecutions in determining responsibility for one's acts, supports the rule that where it reasonably might or should have been foreseen by the accused that the commission of or attempt to commit the contemplated felony would be likely to create a situation which would expose another to the danger of injury at the hands of a nonparticipant in the felony, the creation of such dangerous

situation is to be regarded as the proximate cause of death from such injury. (*Commonwealth* v. *Moyer*, 357 Pa. 181 [53 A.2d 736]; *Commonwealth* v. *Almeida*, 362 Pa. 596 [68 A.2d 595, 12 A.L.R.2d 183], cert. den. 339 U.S. 924 [70 S.Ct. 614, 94 L.Ed. 1346]; *People* v. *Podolski*, 332 Mich. 508 [52 N.W.2d 201], cert. den. 344 U.S. 845 [73 S.Ct. 62, 97 L.Ed 657], reh. den. 344 U.S. 888 [73 S.Ct. 185, 97 L.Ed. 687]; *Letner* v. *Tennessee*, 156 Tenn. 68 [299 S.W. 1049, 55 A.L.R. 915].)

Another line is to the effect that where persons engaged in the commission of a felony compel the victim of the homicide to occupy a position of danger for the purpose of aiding them in the perpetration of the felony or of effectuating their escape from the scene of the crime, such compulsion may be regarded as the proximate cause of death accidentally resulting, by reason thereof, from the act of a nonparticipant in the felony. (*Keaton* v. *State*, 41 Tex.Crim.Rep. 621 [57 S.W. 1125]; *Taylor* v. *State*, 41 Tex.Crim.Rep. 564 [55 S.W. 961], later app. (Tex.Crim.App.) 63 S.W. 330; *Wilson* v. *State*, 188 Ark. 846 [68 S.W.2d 100].)

On the other hand, there is some authority for the view that one engaged in the commission of a felony cannot be held criminally liable for the accidental killing of another in the course of the transaction by one who is not a participant in the felony. (*Commonwealth* v. *Moore*, 121 Ky. 97 [88 S.W. 1085, 2 L.R.A. N.S. 719, 123 Am.St.Rep. 189, 11 Ann. Cas. 1024]; *Commonwealth* v. *Campbell*, 89 Mass. (7 Allen) 541 [83 Am.Dec. 705]; *Butler* v. *People*, 125 Ill. 641 [18 N.E. 338]; *State* v. *Oxendine*, 187 N.C. 658 [122 S.E. 568]; *People* v. *Garippo*, 292 Ill. 293 [127 N.E. 75].) These cases are based on the theory that no person can be held responsible for a homicide unless the act was either actually or constructively committed by him; and that, in order to be his act, it must be committed by him or by someone acting in concert with him or in furtherance of a common design or purpose.

The principle of proximate cause applies to crime as to tort. Green, in "Rationale of Proximate Cause," states (p. 132) : "Causal relation is the universal factor common to all legal liability. On the other hand, the constituents of the other elements of legal liability change with every type of action. In assault they are different from what they are in deceit; in contract different from what they are in crime. They constitute the universal variants. But causation is as much an element in an accident as in battery; in a breach of

contract as in murder. And it is exactly the same problem wherever found and is soluble by the same process.''

Wharton, in his treatise on homicide, says ''one whose wrongful act hastens or accelerates the death of another, or contributes to its cause, is guilty of homicide, though other causes co-operate. And he is guilty if his act was the cause of the cause of death; if the relation was causal, and the injured condition was not merely the occasion upon which another cause intervened not produced by the first injury, or related to it in any other than a casual way, then the person inflicting the injury is guilty of homicide. . . . An unconscious agent, acting in such a way as might ordinarily be expected from the defendant's act, does not break the causal connection, even in malicious homicide. . . . If a killing was the direct result of a felonious act it is murder, both under the rules of common law and under the various statutory provisions, without reference to the manner or method in which it was effected, or whether it was caused immediately by the act of the accused, or was merely the result of his acts; it is not necessary in order to convict him of murder that his actual and personal violence was the sole cause of death.'' (Wharton on Homicide, 3d ed., §§ 27, 37, 125.)

In an article titled ''*Proximate Cause in the Law of Homicide*,'' (12 So.Cal.L.Rev. 19), it is said (p. 30) : ''The ordinary physical responses of the human body are not intervening causes of which the law takes cognizance. . . . [P. 33.] The act of a responsible human agent may intervene to constitute the final effective cause of death, and yet the initial act of the defendant may retain its causal character. Such cases are presented by two situations: (1) Where the intervening human act is a foreseeable consequence of the defendant's act. . . . [P. 38.] Where *A* causes injury to or perpetrates some wrong upon *B*, but an intervening act of *C* is the actual cause of death, the responsibility of *A* depends upon whether his act substantially increased the risk that the act of *C* would take effect upon *B*. Illustrative is the California case of *People* v. *Fowler* [178 Cal. 657, 174 P. 892 (1918)]. *A* feloniously assaulted *B* and left him lying helpless on a roadside. There was evidence that the actual cause of death was an injury inflicted by a passing vehicle upon *B* while lying in his helpless condition. *A* was held guilty of homicide, as the intervening cause (the injury from the vehicle) was the natural and probable result of *A*'s conduct.''

''In determining whether the act of accused has caused

death, the test is whether such act has contributed to the death; and, if it has, responsibility is not avoided by the fact that independent causes, such as the negligence of deceased or others, have also contributed. . . . The act of accused must be a proximate cause of death but need not be the direct, immediate cause. . . . To warrant a conviction for homicide it is necessary, but sufficient, to establish that the act of accused was a proximate cause of death. In this connection proximate cause does not necessarily mean the last act of cause or the act nearest in point of time to the death; it means rather nearness in point of causal relation. Accused's act or omission need not be the immediate cause of the death and he is responsible if the direct cause resulted naturally from his conduct.'' (40 C.J.S. 851, 854, § 11.)

Perkins on Criminal Law says:

''The 'felony-murder rule' is often couched in some such form as this: 'Homicide committed while perpetrating or attempting a felony is murder.' This suggests mere coincidence as sufficient for the result; but the actual requirement is causation. It is necessary to show that 'death ensued in consequence of the felony.' It is not necessary, however, to show that the killing was intended or even that the act resulting in death was intended. It may have been quite unexpected. . . .

''Factually any response of a human being to harm or threat of harm is a consequence of whatever produced such harm or threat, and insofar as the response is a normal one this actual causation is recognized by law. Hence an act resulting in harm or threat of harm is the proximate cause of further harm caused by such response thereto. . . .

''Perhaps the most typical instance of intervening cause in the form of an act, which is *dependent* upon a prior act, is the impulsive movement made in the effort to avoid sudden peril created by the prior act. In the words of Lord Coleridge: 'If a man creates in another man's mind an immediate sense of danger which causes such person to try to escape, and in so doing he injures himself, the person who creates such a state of mind' is the proximate cause of the injuries which result. . . .

''If a *felonious assault* engenders such terror as to cause an impulsive act of avoidance which results in loss of life, the attack is the proximate cause of the death 'whether or not the act of avoidance was that of a reasonably prudent person under the circumstances.' It would be absurd to permit a

murderous assailant to escape on the theory that the death resulted not from his act but from a imprudent defensive act of his victim in the sudden terror of the moment; and hence the juridical view of the causal relation is extended because of the moral obliquity of the defendant's action.

"Where the intervening act is an impulsive movement in the effort to avoid impending danger, the law of proximate cause does not require that the harm which actually happened should have been foreseeable. Frequently it is foreseeable. If a loaded weapon is pointed at another at close range it may be foreseeable that he may grab for it and perhaps cause a discharge in this way. . . .

"While an impulsive act which is merely the normal response to fear or other emotional disturbance, or the undirected bodily movement of one who has been deprived of his reason, will be imputed to him who has caused this emotional disturbance or loss of mind, the scope of proximate cause goes far beyond this. Even the deliberate act of the one threatened or endangered, or that of another in his behalf, in the effort to avoid injury to person or damage to property, will not be a superseding cause if it is merely the normal response of a human being to the stimulus of the situation created by the wrongdoer. . . .

"It is merely a normal human response for the intended victim of a robbery, who is shot at or threatened by robbers, to return their fire and this is not a superseding cause. And hence if such return-fire should by accident cause the death of an innocent bystander, his death is imputable to the robbers and they are guilty of murder. . . .

"Shepherd threw a lighted squib into a crowded marketplace and it fell near Willis who, to protect himself, threw it away and it fell near Ryal who also threw it for his protection. It then fell upon Scott and exploded at that instant putting out one of his eyes. It was held that Shepherd had put out Scott's eye. A recent case followed a similar pattern but with even more serious consequences. After defendant had released the trigger mechanism of a hand grenade and thrown it near a crowd, one member kicked it away from himself and it landed near another who was killed by the explosion. There was held to be no break in the line of causation and nothing which would preclude conviction of murder," citing *Madison* v. *State*, 234 Ind. 517 [130 N.E.2d 35]. (Perkins on Criminal Law, 35, 622-624, 632, §§ 1, 9.)

Wharton says: "When the killing occurs as the result of gunfire it is immaterial whether the fatal shot is fired by the victim of the contemplated felony or a fellow conspirator of the defendant." (1 Wharton's Criminal Law and Procedure 547, § 253.)

The facts in *Commonwealth* v. *Almeida*, 362 Pa. 596 [68 A.2d 595, 12 A.L.R.2d 183], were that the defendant and confederates committed an armed robbery. In attempting to escape, they fired several shots at a policeman. In returning their fire, the policeman killed Ingling, a bystander. Holding the defendant robber guilty of first degree murder, the court stated (68 A.2d 602):

"In the instant case we do not have to rely upon inferences to support the fact that Almeida and his confederates started the chain of events that resulted in the death of Officer Ingling. Their acts were 'the cause of the cause' of the murder. They 'set in motion the physical power' which resulted in Ingling's death and they are criminally responsible for that result. Whether the fatal bullet was fired by one of the bandits or by one of the policemen who were performing their duty in repelling the bandit's assault and defending themselves and endeavoring to prevent the escape of the felons is immaterial. Whoever fired the fatal shot, the killing of Officer Ingling had its genesis in the robbing by the defendant and his confederates of the Acme Market, and in their firing upon the police officers who in the performance of their duty were attempting to take them into custody. . . .

"[P. 610.] Under neither the common law nor our statute is an *accidental killing* murder. It is not even a felony. Yet this court has uniformly held that an accidental killing in the perpetration of or the attempt to perpetrate a robbery or burglary or any other of the enumerated felonies is murder in the first degree. The reason is that any person committing or attempting to commit, any of these major felonies is *motivated by malice* and when the killing of a human being directly results, even though *not intended*, from his malicious act, it is murder because *malice*, the essential element of murder, *is present*. The felon's malicious act in perpetrating or attempting to perpetrate, his planned major crime is justly regarded by the law as the causative antecedent of the homicide. In cases of this kind society puts its punitive hand on the person responsible for the legally blamable cause. This doctrine is authoritatively recognized in the law. . . .

"In the instant case the act of intervention by the police officer, i.e. the shooting at the bandits, *was* the natural result of defendant's act. . . .

"[P. 611.] Almeida cannot escape responsibility for what was the 'probable consequence of the criminal scheme' to commit a robbery and make his escape by shooting at, with intent to kill, officers who were trying to capture him. . . .

"[P. 612.] If Mrs. Ingling should bring an action in tort against Almeida and his confederates for causing the death of her husband there is no doubt of her ability to recover a judgment against them. Since 'causal relation is the universal factor common to all legal liability' (Green 'Rationale of Proximate Cause,' *supra*) and since, as Professor Beale pointed out (*supra*), 'All liability is based on proximate cause' and 'the same principles determine criminal responsibility [as determines civil liability],' why should not Almeida be held *criminally*, as well as civilly, responsible for Officer Ingling's death? . . .

"[P. 614.] When men engaged in a scheme of robbery arm themselves with loaded revolvers they show that they expect to encounter forcible opposition and that to overcome it they are prepared to kill anyone who stands in their way. If in the course of their felonious enterprise they open deadly fire upon policemen or others and if in self-defense and to vindicate the law the fire is returned and someone is killed by a bullet fired in the exchange of shots, who can challenge the conclusion that the *proximate cause* of the killing was the malicious criminal action of the felons? No *other* genesis can justly be assigned to the homicide. The felons should be adjudged guilty of murder in the perpetration of a robbery, that is, murder in the first degree. As President Judge King said 105 years ago in *Commonwealth* v. *Hare, supra* [1844, 2 Pa. LJR 467] : 'Such we believe to be the law, founded on the plainest reason, justified by the clearest expediency, and demanded by the most obvious necessity.' " The reasoning of *Commonwealth* v. *Almeida, supra,* was approved and followed in *Hornbeck* v. *State* (Fla.), 77 So.2d 876. (Also see *Madison* v. *State,* 234 Ind. 517 [130 N.E.2d 35, 38].)

In *People* v. *Podolski,* 332 Mich. 508 [52 N.W.2d 201], cert. den. 334 U.S. 845 [73 S.Ct. 62, 97 L.Ed. 657], reh. den. 334 U.S. 888 [73 S.Ct. 185, 97 L.Ed. 687], the defendant participated in an armed robbery of a bank. During his attempt to escape and an ensuing gun battle with police officers, an officer was killed by a bullet from the weapon of a fellow officer. The

court, quoting with approval from *Commonwealth* v. *Moyer*, 357 Pa. 181 [53 A.2d 736, 741], held that the defendant had been properly convicted of murder of the first degree, and said (52 N.W.2d 204): "When a defendant deliberately engenders an affray, deliberately using therein a lethal weapon, it must be considered to be within his intent that death should result from the affray as a natural and probable consequence of his acts, where the death is directly attributable to the affray and not resulting from some independent intervening cause."

In *Taylor* v. *State*, 41 Tex.Crim.Rep. 564 [55 S.W. 961, 964], the facts were that during an attempt to rob a train one of the robbers took Johnson, a fireman on the train, from the engine to the front of the express car. While Newman and Johnson were at the express car, Buchanan, a passenger on the train, came out of a passenger coach and began firing. The robbers returned the fire. The fireman was shot and killed by a bullet fired by the passenger. The defendant objected to the charge on the ground, first, that the evidence did not show the defendant and those acting with him placed Johnson in front of the express car to have him shot, but to prevent a shooting; and second, because it was not more dangerous in front of the express car than at any other place along the line. The court stated: "The whole question here is one of causal connection. *If the appellant here set in motion the cause which occasioned the death of deceased, we hold it to be a sound doctrine that he would be as culpable as if he had done the deed with his own hands.*" (Emphasis added.) The court then cited the following from 2 Bishop, New Criminal Law, section 424, etc.: "He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will *contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it.*" (Emphasis added.) The court continued: "They [the robbers] put him [the fireman] there in order to effect the robbery, and while they required him to remain at the post assigned him, which was a place of danger, he was shot. His life was taken on account of their direct and lawless act, and they are responsible for his murder, whether it was occasioned by their own volition or by the shots of their adversaries; and their act was

the proximate cause of the destruction of his life, and they cannot escape the consequences.''

In *Wilson* v. *State*, 188 Ark. 846 [68 S.W.2d 100, 102], the defendants were charged with the murder of a bank teller. In effecting their escape after robbing a bank they forced the teller to accompany them in an attempt to shield themselves from an attack by the town marshal. The town marshal accidentally killed the teller when shooting at the robbers. It was held the defendants were guilty of murder both at common law and under the statute.

The facts in *People* v. *Krauser*, 315 Ill. 485 [146 N.E. 593], were these: Glass, the owner, and Souders, a police officer, were in a store. The defendant and others started to rob the store at the point of a revolver. Souders grabbed one of the robbers and in the meleé was killed. It was said (146 N.E. 601):

''The plaintiff in error [defendant] contends that the shot which killed Souders was fired by Souders himself; that for that reason the plaintiff in error cannot be responsible for murder, and that instructions asked on the subject of manslaughter should have been given. . . . [I]f it be admitted that Souders shot himself in the struggle for the gun, such a result might reasonably have been anticipated when he started to rob at the point of a revolver. There was no evidence which required the giving of instructions on the subject of manslaughter.''

The court then distinguished *Butler* v. *People*, 125 Ill. 641 [18 N.E. 338, 339, 8 Am.St.Rep. 423, 1 L.R.A. 211], cited by defendant, saying (p. 601):

''In *Butler* v. *People*, 125 Ill. 641 [18 N.E. 338, 1 L.R.A. 211, 8 Am.St.Rep. 423], a riot was in progress in which the plaintiffs in error were taking part. The marshal of the village attempted to arrest one of the plaintiffs in error, but he was resisted, and the bystanders undertook to stop the fight. While they were parting the men the marshal discharged his revolver, and one of the bystanders was killed. An indictment for murder was returned against the rioters, and two of them were convicted of manslaughter. The conviction was reversed, and it was held that there existed no common purpose or design between the defendants and the marshal, and the former were not responsible for the acts of the latter. It was said, however, that they would be responsible for what they did themselves and such consequences as might naturally flow from their acts and conduct. The

shooting of Souders was a consequence naturally to be expected from the plaintiff in error's acts. He made an assault with a deadly weapon, and Souders was justified in resisting the attack, and would have been justified in killing the plaintiff in error to prevent the crime. He seized the plaintiff in error, and in the struggle the revolver was discharged. It is not material whether it was in the hand of the plaintiff in error or Souders. The plaintiff in error had the intent to commit murder if resisted. He was resisted, and the struggle resulted in the discharge of the revolver and the death of Souders. It was the act of the plaintiff in error, whether his hand or Souders' held the revolver, and the crime was murder and not manslaughter.'' (Also see *People* v. *Payne,* 359 Ill. 246 [194 N.E. 539, 543]; *Miers* v. *State,* 157 Tex.Crim.Rep. 572 [251 S.W.2d 404, 407-408]. Other cases holding a felon liable for a result proximately caused by the commission of a felony are: *People* v. *Lewis,* 124 Cal. 551 [57 P. 470]; *People* v. *Fowler,* 178 Cal. 657, 667-670 [174 P. 892]; *People* v. *Perry,* 14 Cal.2d 387, 393 [94 P.2d 559, 124 A.L.R. 1123]; *Johnson* v. *State,* 142 Ala. 70 [38 So. 182, 183, 2 L.R.A. N.S. 897]; *State* v. *Block,* 87 Conn. 573 [89 A. 167, 49 L.R.A. N.S. 913]; *State* v. *Leopold,* 110 Conn. 55 [147 A. 118, 121]; *State* v. *Bessar,* 213 La. 299 [34 So.2d 785, 789]; *State* v. *Schaub,* 231 Minn. 512 [44 N.W.2d 61, 64-65]; *State* v. *Glover,* 330 Mo. 709 [50 S.W.2d 1049, 1054, 87 A.L.R. 400]; *Letner* v. *State,* 156 Tenn. 68 [299 S.W. 1049, 1051, 55 A.L.R. 915]; *State* v. *Badgett,* 87 S.C. 543 [70 S.E. 301]; *Spies* v. *People* (The Anarchists' Case), 122 Ill. 1 [12 N.E. 865, 961, 17 N.E. 898, 3 Am.St.Rep. 320].)

The British courts, like our own, have applied the principle of proximate cause in determining guilt in criminal cases. (See *Queen* v. *McIntyre,* 2 Cox C.C. 379; *Reg.* v. *Towers,* 12 Cox's Crim. Cases 530, 533; *Reg.* v. *Michael,* 9 Car. & P. 356, 2 Moody C.C. 120; *Rex* v. *Hickman,* 5 Car. & P. Rep. 151; *Rex* v. *Valade,* 26 Can. Crim. Cases 233.)

In *People* v. *Manriquez,* 188 Cal. 602 [206 P. 63, 20 A.L.R. 1441], the facts were that a homicide resulted from the attempt of the defendant and two others to rob a store. The defendant testified that as soon as he ''put his gun on him [the Chinese proprietor] . . . he tried to grab it. . . . When the Chinaman grabbed at me, the pistol went off, and he went down, and I ran out.'' Although the *immediate* force which caused the revolver to go off *was supplied by the victim in grabbing the gun,* the defendant and his accomplices were

held to be guilty of murder in the first degree and their conviction was affirmed.

In *People* v. *Caballero*, 31 Cal.App.2d 52 [87 P.2d 364], one of several confederates killed another of the confederates while they were engaged in perpetrating robbery in furtherance of a common purpose. Conviction for murder of the first degree was affirmed. After quoting Penal Code, section 189, the court stated (p. 56):

"[I]t is well settled that one who kills another under such circumstances is guilty of murder of the first degree by force of the statute, altogether regardless of any question of intent. The killing may be wilful, deliberate and premeditated, or it may be absolutely accidental; in either case the slayer is equally guilty since the statute applies to all homicide so committed, not merely to such as might be planned as a part of the execution of the felony intended; and it is proper so to instruct the jury."

The court distinguished *People* v. *Ferlin*, 203 Cal. 587 [265 P. 230], and *People* v. *Garippo*, 292 Ill. 293 [127 N.E. 75], relied on by defendants, saying (p. 59): "In support of their position appellants cite *People* v. *Ferlin*, 203 Cal. 587 [264 P. 230], but an examination of the factual situation therein shows it is entirely different from the one here presented, for the reason that there the coconspirator killed himself while he alone was perpetrating the felony he conspired to commit; whereas, here the coconspirator was killed by one of his confederates while all were perpetrating the crime they conspired to commit. To be more specific, the facts of that case were these: The defendant Ferlin hired a young man named Skala to destroy an insured building by fire, and while starting the fire with gasoline (Ferlin not being present) Skala burned himself so severely he died shortly afterwards from the effects of the burns. Ferlin was charged with and found guilty of arson, murder, and destruction of an insured building. The trial court granted a new trial on the murder conviction, and in sustaining the order on appeal, it was held in substance and effect that inasmuch as Skala killed himself Ferlin could not be held criminally responsible for his death. In the present case Ancheta did not kill himself and no one makes any such claim. The shot that killed him was fired, as the evidence shows, by Dasalla, a coconspirator, and the fatal shooting occurred during the perpetration of a robbery. Therefore the case falls clearly within the provisions of said section 189; and under the doctrine of the authorities above

cited, not only Dasalla, who did the shooting, but all who participated with him in the perpetration of the robbery were guilty of first degree murder regardless of whether Dasalla fired the shot intentionally or accidentally. Nor is the case of *People* v. *Garippo*, 292 Ill. 293 [127 N.E. 75], cited in the Ferlin case and upon which the appellants also rely, in point for the reason that there the evidence failed to show that the shot that killed the coconspirator was fired by any of his confederates. According to the opinion, it was fired by some person unknown, and the decision exculpating the coconspirators was apparently placed on that ground. Here, as stated, there was direct evidence to the effect that Ancheta was shot by Dasalla."

*People* v. *Garippo, supra,* was also distinguished from the present factual situation in *Commonwealth* v. *Almeida, supra,* 362 Pa. 596 [68 A.2d 595, 12 A.L.R.2d 183].

In *People* v. *Chavez,* 37 Cal.2d 656 [234 P.2d 632], the court stated (p. 669) : "In his argument, Chavez erroneously assumes that to bring a homicide within the terms of section 189 of the Penal Code, the killing must have occurred 'while committing,' 'while engaged in,' or 'in pursuance' of the named felonies, and that the killing must have been 'a part of' the felony or attempted felony 'in an actual and material sense, and have resulted as a natural and probable consequence thereof.' The law of this state has never required proof of a strict causal relationship between the felony and the homicide. The statute was adopted for the protection of the community and its residents, not for the benefit of the lawbreaker, and this court has viewed it as obviating the necessity for, rather than requiring, any technical inquiry concerning whether there has been a completion, abandonment, or desistence of the fenoly before the homicide was completed.

"In *People* v. *Boss,* 210 Cal. 245, 252, 253 [290 P. 881], this court said that the felony murder rule '. . . was adopted to make punishment of this class of crime more certain. It was not intended to relieve the wrongdoer from any probable consequences of his act by placing a limitation upon the *res gestae* which is unreasonable or unnatural.' The homicide is committed in the perpetration of the felony if the killing and felony are parts of one continuous transaction. (*People* v. *Miller,* 121 Cal. 343 [53 P. 816].) "

Two illustrations from the Restatement of Torts are apposite : Illustration 2, comment (c) of § 445 : "*A* incites a mob to attack a jail in order to lynch *B,* a prisoner therein.

*C,* one of the wardens, in resisting the attack fires on the mob. One of the bullets goes astray and enters the kitchen window of a nearby house, causing harm to *D* who is cooking supper therein. *C's* action is not a superseding cause of *D's* harm.''

If *D* was *killed* why should not *A* be held *criminally* responsible?

Illustration 3, comment (c) of § 445: ''*A* attacks *B* upon the street. *B* raises his cane to ward off *A's* attack. In so doing he strikes *C*, a fellow traveler. *A's* attack upon *B* is the legal cause of the harm sustained by *C*.''

If such is the law, and it is, why should not the actions of Harrison and his confederates be held to be the legal cause of the death of Williams? Firing a pistol to ''ward off an attack'' by bandits is in law no different from raising a cane to ''ward off'' an attack.

New York cases cited by defendants are not helpful. There the definition of felony-murder as ''the killing of a human being . . . is murder in the first degree, when committed . . . by a person engaged in the commission of, or attempt to commit a felony, either upon or affecting the person killed or otherwise . . .'' differs from the definition in section 189 of the Penal Code. The New York statute limits the doctrine of felony-murder by its restrictive wording, ''by a person.'' The difference between the Pennsylvania and New York decisions on what appear to be similar facts results not from conflicting fundamental theories of causation in crimes as from the dissimilarity in the statutory definitions of felony-murder, particularly with respect to identification of the act which shall be considered the crime (i.e., the legal cause).

*Commonwealth* v. *Campbell,* 89 Mass. (7 Allen) 541 [83 Am.Dec. 705], relied on heavily by defendants, was disapproved in *Commonwealth* v. *Almeida, supra,* 362 Pa. 596 [68 A.2d 595, 12 A.L.R.2d 183]. The Supreme Court of Pennsylvania said (68 A.2d 609):

''In the Massachusetts opinion the following question is put: 'Suppose, for example, a burglar attempts to break into a dwelling house, and the owner or occupant, while striving to resist and prevent the unlawful entrance by misadventure kills his own servant. Can the burglar in such case be deemed guilty of criminal homicide?' The Massachusetts court answered: 'Certainly not.' That conclusion is without support in common sense and is inconsistent with sound public policy. Where a burglar or kidnapper breaks into a man's home with the intent to steal property therein or to kidnap a child and

while so engaged opens fire upon the occupants, and the man of the house returns the fire in an attempt to defend his family, and by mischance he kill his wife or his child, or his servant, the invading felon is *morally and legally responsible for that homicide.* In Pennsylvania and in other jurisdictions such a felon would be adjudged guilty of murder in the first degree. His malicious act would be the proximate cause of the homicide.''

We think the better reasoning is that of the authorities to which we have referred, to the effect that the doctrine of proximate cause is applicable in criminal proceedings in determining responsibility for a person's acts; that where it reasonably might or should have been foreseen by the accused that the commission of or the attempt to commit the contemplated felony would be likely to create a situation which would expose another to the danger of death at the hands of a nonparticipant in the felony, the creation of such situation is the proximate cause of the death; and that the killing is murder of the first degree committed by the accused.

No one disputes the fact that the shooting of Williams resulted directly from the attempted robbery and from Jones' resistance to defendant Harrison. It makes no difference that defendants could not know in advance the precise course of events that would follow when they attempted the robbery. Their attempted robbery set in motion a chain of events which were, or should have been, within their contemplation when the motion was initiated. It was a normal human response for Jones, one of the victims of the attempted robbery, who was shot at by Harrison, to return the fire. The shooting at Harrison was the natural result of defendants' acts. The killing of Williams was the natural, foreseeable result of the initial act. The attempted robbery was the proximate cause of the death. We can see no sound reason for distinction merely because Williams was killed by a shot from the gun of Jones, fired at Harrison in self-defense. The killing was murder and it was committed in the perpetration of attempted robbery within the meaning of Penal Code, section 189.

Defendant Asberry asserts the court erred in admitting in evidence an incriminating statement he made to officers. He argues that the corpus delicti of murder was not proved, hence his statement was inadmissible. Since we have held that the corpus delicti was proved, the point is not well taken. Further, the attempts to commit robbery were proved and the state-

ment was admissible for the purpose of connecting Asberry with those offenses.

The judgments and the orders denying new trials are affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied February 10, 1960.