Filed 12/26/23  P. v. Aramburo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079469 |
| v. | (Super. Ct. No. FWV025155) |
| CARLOS ARAMBURO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Jon D. Ferguson, Judge.  Affirmed.

Raymond M. DiGuiseppe, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Amann, and Susan E. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Carlos Aramburo appeals the trial court's denial of his motion for resentencing under Penal Code section 1172.6.[1]  We affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

Carlos Yuman owned a used car dealership located in El Monte, in Los Angeles County.  On April 22, 2002, Yuman was meeting with two customers, Allen and Kathleen Salas, in an office at the dealership.  Juan Mingucha, an employee, was waiting outside.  Defendants [Aramburo and Jorge D. Ituarte[2]] approached the office, pushed Mingucha into the office, and entered.  Aramburo pulled a semiautomatic gun from his waistband, cocked it, and pointed it at Mingucha.  While Ituarte rummaged through a desk and knocked things over, Aramburo demanded money from the Salases and told Ituarte to get Yuman's wallet, which he did.  Yuman and the Salases each turned over money to [Aramburo and Ituarte].  Aramburo demanded money from Mingucha, but he had no money.  [Aramburo and Ituarte] also took two briefcases from the office and a watch from Yuman.

Two days later, [Aramburo and Ituarte] approached Maria Ester Espinoza DeMoreno and Enrique Orosco in the parking lot of a Smart & Final store in Ontario, in

---

[1]  All further statutory references are to the Penal Code.

[2]  Ituarte is not a party to this appeal.

San Bernardino County. DeMoreno and Orosco were placing groceries into their Dodge Durango. Aramburo demanded the keys to the Durango. When Orosco did not turn over the keys immediately, Aramburo pulled a semiautomatic gun from his waistband and told Orosco, 'I'm going to shoot you.' DeMoreno gave the keys to Aramburo, who passed them to Ituarte. Ituarte got into the driver's seat and began to drive away. Aramburo caught up with Ituarte in the parking lot and got into the passenger seat. Ituarte then drove away. The incident was promptly reported to a 911 operator.

Shortly afterward, Ontario Police Officer James Trousas, who was driving in a marked police car, spotted the Durango and a chase ensued. Ituarte drove the Durango through a red light onto a freeway, where he reached speeds up to 100 miles per hour while swerving through traffic. Leaving the freeway, he entered an intersection against a red light and collided with a red pickup truck [about 2 minutes and 45 seconds after the pursuit began]. Lindy Garcia, a passenger in the truck, died approximately 17 hours later as a result of injuries from the collision.

Aramburo was apprehended and taken into custody at the scene of the collision. Ituarte ran from the scene but was apprehended a short distance away by a police officer. While handcuffed, Ituarte resisted efforts by officers to place him in a police car.

During a search of the Durango, police found a semiautomatic gun and some of DeMoreno's jewelry in the seat of the car. Prior to defendants' taking of the Durango, the jewelry had been inside two bags in the glove compartment. Other jewelry belonging to DeMoreno, which had been in the car, was found in each of the defendants' pockets.

3

Yuman's watch and a traffic citation that had been in one of Yuman's briefcases were also found on Aramburo after his arrest. Aramburo admitted the carjacking, possession of the gun, taking the jewelry, stealing the traffic citation, and being in the Durango.

A jury convicted Aramburo of murder (§ 187, subd. (a)), carjacking (§ 215, subd. (a)), robbery (§ 211), two counts of assault with a semiautomatic firearm (§ 245, subd. (b)), making a criminal threat (§ 422), and evading a police officer causing death (Veh. Code, § 2800.3). Aramburo was sentenced to 25 years to life, plus 37 years and 10 months, and we affirmed his convictions and sentence in 2006.

In 2019, Aramburo petitioned for resentencing under section 1170.95, which is now section 1172.6. The trial court denied the petition on the ground that Senate Bill No. 1437, which enacted section 1170.95, was unconstitutional. (*People v. Aramburo* (June 30, 2020, E073366) [nonpub. opn.].) We reversed and remanded with directions to consider the petition on the merits. (*Ibid*.)

On remand, the trial court issued an order to show cause and set the matter for an evidentiary hearing. After holding the hearing, the trial court denied the petition, finding that defendant was a major participant who had acted with reckless indifference for human life during the commission of the offenses.

4

III.

DISCUSSION

Aramburo contends the trial court erroneously denied his petition because (1) he played a "limited and attenuated role" in the car chase and resulting accident, and (2) the court failed to consider his youth in determining whether he acted with reckless indifference to human life. We conclude the trial court properly found that Aramburo was not entitled to resentencing relief under section 1172.6, even considering his youth.

A. *Governing Law*

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 846-847 (*Gentile*); see Stats. 2018, ch. 1015, § 1, subd. (f).) The Legislature accomplished this by amending sections 188 and 189.

Senate Bill No. 1437 amended section 189 so that "[d]efendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life[.]'" (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*), citing § 189, subd. (e)(3).) The Legislature amended section 188 to provide that, when the felony-murder rule does not apply, a principal in the crime of murder can only be convicted

5

where he acted "with malice aforethought," and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); see *Gentile*, *supra*, 10 Cal.5th at pp. 842-843.)

Senate Bill No. 1437 also created a procedure for offenders previously convicted of felony murder or murder under the natural and probable consequences doctrine to seek retroactive relief if they could no longer be convicted of murder under the new law. (§ 1172.6, subd. (a); *Gentile*, *supra*, 10 Cal.5th at p. 843; *People v. Lewis* (2021) 11 Cal.5th 952, 959; *Strong*, *supra*, 13 Cal.5th at p. 708.) "[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citations], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019' . . . ." (*Strong*, *supra*, at p. 708.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.]" (*Ibid.*, citing § 1172.6, subd. (c).) If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether relief should be granted. (§ 1172.6, subds. (c), (d)(3).)

At the evidentiary hearing, the court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. (§ 1172.6, subd. (d)(3).) The petitioner and the People may also offer new or

6

additional evidence. (§ 1172.6, subd. (d)(3); see *Gentile*, *supra*, 10 Cal.5th at pp. 853-854.) "'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.'" (*Strong*, *supra*, 13 Cal.5th at p. 709; accord, *People v. Lewis*, *supra*, 11 Cal.5th at p. 960.) Section 1172.6 "relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life . . . .'" (*Strong*, *supra*, at p. 710.)

Under the amended felony-murder rule, a defendant who was not the actual killer and did not act with the intent to kill can only be liable for murder if he or she was a major participant in the underlying felony and acted with reckless indifference to human life. (*Strong*, *supra*, 13 Cal.5th at p. 708, citing § 189, subd. (e)(3).) Because "'[t]he standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2[, subdivision] (d),'" "death penalty cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), are controlling here." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123 (*Guiffreda*).)

7

Considerations that "may play a role in determining whether a defendant's culpability is sufficient" for a finding he or she was a major participant under section 190.2, subdivision (d), include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted; see *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591; *Guiffreda*, *supra*, 87 Cal.App.5th at pp. 124-125.)

To determine whether a defendant exhibited reckless indifference to human life under section 190.2, subdivision (d), courts consider, among other factors, the following seven questions: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins*

8

(2020) 9 Cal.5th 667, 677 (*Scoggins*); see *Clark*, *supra*, 63 Cal.4th at pp. 618-623; see *Guiffreda*, *supra*, 87 Cal.App.5th at pp. 124-125.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The requirements for finding major participation and reckless indifference to human life "'significantly overlap . . . in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 615; see *People v. Owens* (2022) 78 Cal.App.5th 1015, 1023.) "No one of these considerations is necessary, nor is anyone one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803; see *Clark*, *supra*, at p. 618.) Courts analyze the totality of circumstances (*Scoggins*, *supra*, 9 Cal.5th at p. 677) to determine whether the defendant acted with reckless indifference to human life or was a major participant. (See *People v. Owens*, *supra*, at p. 1023.)

9

B. *Standard of Review*

On appeal from an order denying a petition under section 1172.6, we review the trial court's factual findings for substantial evidence. (*People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090.) We "'"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; see *Guiffreda*, *supra*, 87 Cal.App.5th at pp. 124-125.) "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)

C. *Analysis*

We first address Aramburo's suggestion that the carjacking and subsequent car chase that resulted in a fatal crash are distinct events for which he bears different liability. Aramburo emphasizes that it was Ituarte's reckless driving that killed Garcia and that, as a passenger, his ability to control Ituarte's behavior was "quite limited if not non-existent under the circumstances." Aramburo thus contends his culpability for Garcia's death is

10

"sharply attenuated."

We disagree. Robbery is not confined to the act of unlawfully taking another's property. (*People v. Debose* (2014) 59 Cal.4th 177, 205.) The crime remains ongoing until the perpetrator reaches a place of temporary safety. (*Ibid*.) This means that "[a] robber has not reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress." (*Ibid*.) Under a corollary doctrine known as the escape rule, a "'killing committed by a robber during his or her flight from the scene of the crime, and before reaching a place of temporary safety, comes within section 189.'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 341.) Even if the killing is unintentional, "'[f]elony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety because the robbery and the accidental death, in such a case, are parts of a "continuous transaction."'" (*Id*. at p. 345.) As a result, several courts have upheld felony-murder convictions in cases where the defendant accidentally killed someone while fleeing the scene and before reaching a place of temporary safety. (See, e.g., *People v. Russell* (2010) 187 Cal.App.4th 981, 991-992; *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 79-80; *People v. Johnson* (1992) 5 Cal.App.4th 552, 561-562.) A nonkiller may also be liable for the killing under the escape rule. (*People v. Cavitt* (2004) 33 Cal.4th 187.)

In other words, the robbery/carjacking, car chase, and fatal car crash were all part of one continuous transaction. (See *People v. Hernandez* (2021) 60 Cal.App.5th 94, 113, 274 [burglary and murder were part of same continuous transaction for purposes of

11

felony-murder because defendant had not yet reached a place of temporary safety after fleeing burglary scene].) Although Ituarte was the person who actually killed Garcia with his reckless driving, under the felony-murder rule, as amended by Senate Bill No. 1437, Aramburo remains liable for felony-murder under Senate Bill No. 1437 if he was a major participant and acted with reckless disregard during the robbery, *which remained ongoing at the time of the crash*. We therefore must consider Aramburo's conduct during the entire sequence of events that culminated in Garcia's death to decide whether he remains liable for murder after Senate Bill No. 1437.

Applying the factors identified by *Banks*, and viewing the totality of the circumstances (*Scoggins*, *supra*, 9 Cal.5th at p. 677), we conclude substantial evidence supports the trial court's finding that Aramburo was a major participant in the robbery.

First, there was evidence Aramburo was involved in planning the carjacking which led to the fatal collision. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Aramburo demanded the car keys from the carjacking victims at gunpoint then gave them to Ituarte before getting into the passenger seat of the car. Aramburo admitted that he and Ituarte robbed several people at a used car dealership two days before the carjacking, which suggests that they planned the carjacking in the interim.

Second, Aramburo had a role in supplying or using a lethal weapon. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Aramburo used the gun to carjack the victims, including racking the gun and telling the victims, "'I'm going to shoot you.'"

As for the third factor, Aramburo's awareness of the dangers posed by the

12

carjacking and the weapons used, the People argue it weighs against him because he told the investigating officer that he knew he could be charged for murder if the victim of the collision died, as she later did. But this does not necessarily show that Aramburo was aware of the dangers that his conduct during the carjacking posed.

Fourth, Aramburo was present at both the carjacking and the scene of the killing. (*Banks*, *supra*, 61 Cal.4th at p. 803.) He played a "particular role" in the robbery given that he obtained the keys to the car from the victims at gunpoint and handed them to Ituarte before getting in the car. And during the chase, Aramburo did not tell Ituarte to stop when they were speeding away from police because they were already "f—ked" and "the whole thing [was] screwed up."

The fifth factor—what the defendant did after lethal force was used—neither favors nor disfavors Aramburo because police apprehended him immediately after the collision, leaving him no chance to flee or aid the victim.

Given that three of the five *Banks* factors support a finding that Aramburo was a major participant in the robbery, the trial court properly found that he was a major participant. This case is unlike *Scoggins* and *Clark* in which the defendants were unarmed, not present at the scene, and did not know their accomplices were armed or, as in *Clark*, the defendants did not know the accomplice was carrying a loaded gun. (See *Scoggins*, *supra*, 9 Cal.5th at pp. 677-678; *Clark*, *supra*, 63 Cal.4th at p. 613.) Instead, Aramburo was involved in the planning of the robbery, he used a gun during the carjacking to threaten the victims, and he was present at all relevant times. (*Banks*,

13

*supra*, 61 Cal.4th p. 803.)  His "participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major,'" which is the "ultimate question" to be answered in the major-participant analysis. (*Banks*, *supra*, at p. 803.)

We next conclude that substantial evidence supports the trial court's finding that Aramburo acted with reckless indifference under five of the seven *Clark* factors.  First, Aramburo knew that a gun would be used given that he used one while committing the robbery and carjacking and threatened the victims with it.  (*Clark*, *supra*, 63 Cal.4th at pp. 616-617; *In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)  Second, Aramburo was the only one who used a gun in the planned, intentional carjacking.  (See *People v. Keel* (2022) 84 Cal.App.5th 546, 560, 562 [the fact that robbery was "unplanned, spontaneous, and short" showed petitioner did not act with reckless disregard for human life].)  Third, Aramburo was present at the time of both the carjacking and the resulting fatal collision, and "[p]resence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry."  (*People v. Garcia* (2020) 46 Cal.App.5th 123, 148.) Fourth, Aramburo had the opportunity to restrain the crime.  He could have withheld the car keys from Ituarte or fled on foot.  After getting in the car, Aramburo could have told Ituarte to slow down or stop the car, or to otherwise drive more carefully.  Aramburo, however, did none of these things.[3]

---

[3]  When asked whether he told Ituarte to stop, Aramburo replied, "[W]ell dude, wow we're f—ked you know what I mean."  The officer then asked, "So basically you told him you're f—ked, there's a cop behind you and he had the lights on and the siren."

*[footnote continued on next page]*

Finally, the seventh *Clark* factor, the efforts Aramburo made to minimize the risk of violence during the felony, weighs against him. Aramburo held the carjacking victims at gunpoint, racked his gun, and said, "I'm going to shoot you." Aramburo could have minimized the risk of violence (to himself and others) by fleeing on foot, but he chose to get into the car with Ituarte. There is no evidence that, once in the car, Aramburo did anything to lessen the grave risk of death Ituarte posed by driving the car upwards of 100 miles per hour while weaving through traffic and running red lights, such as telling Ituarte to slow down, stop, or surrender. Because there is no evidence that Aramburo made any efforts to reduce the risk of violence at any point, this factor does not support reversal.

However, the fifth factor, the duration of the interaction between the perpetrators of the felony and the victims, weighs in Aramburo's favor given that the carjacking and chase lasted only a few minutes. (See *People v. Henley* (2022) 85 Cal.App.5th 1003, 1015-1016 ["[C]rimes of longer duration present greater risk of violence and therefore evince more reckless indifference."]; *Scoggins*, *supra*, 9 Cal.5th 667, at 681 [no reckless indifference when "entire interaction lasted between a few seconds and three to five minutes"].) The sixth factor, Aramburo's knowledge of Ituarte's propensity for violence or the likelihood of using lethal force, also weighs in Aramburo's favor. Although he and Ituarte committed an armed robbery two days before the armed carjacking, nothing in the record shows that either of them "had ever participated in shootings, murder, or

Aramburo explained, "No, he told me you know, know I was with him man, but what I'm supposed to do."

15

attempted murder." (*Banks*, *supra*, 61 Cal.4th at pp. 810-811.) Nor is there evidence that Aramburo knew Ituarte might use lethal force during either offense. (*Clark*, *supra*, 63 Cal.4th at p. 621.) "The paucity of evidence that [Ituarte] had a propensity to commit violent acts, as well as the lack of evidence that [Aramburo] was aware of any such propensity, undermines the notion that [Aramburo] acted with reckless indifference to human life." (*People v. Keel*, *supra*, 84 Cal.App.5th at p. 561.)

In short, five of the *Clark* factors weigh against Aramburo while two weigh in his favor. Although Aramburo might not have been able to prevent the collision as Ituarte's passenger, the totality of his conduct during the robbery/carjacking and flight demonstrated a conscious disregard for the grave risk of death that his actions created. Substantial evidence thus supports the trial court's finding that Aramburo was a major participant in a felony resulting in death and acted with reckless indifference to human life during the commission of the felony. (See *People v. Bascomb* (2020) 55 Cal.App.5th 1090 ["The defendants who have shown their culpability was too slight under *Banks* and *Clark* 'are those who were not wielding guns themselves and also not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only).' [Citation.]"].)

Aramburo nonetheless argues that the trial court prejudicially erred by failing to consider his youth when denying his petition. The People concede, and we agree, that the trial court should have considered his youth as a factor in deciding whether he acted with reckless indifference to human life. (See *In re Moore* (2021) 68 Cal.App.5th 434, 453-

16

454.)  It is unclear from the record whether the trial court failed to do so.  But even if the court did fail to consider Aramburo's youth, any error was harmless because it is not reasonably probable that he would have obtained a more favorable result had the court considered his youth.

To begin with, a petitioner's youth is a relevant factor in the reckless indifference analysis, but it is not dispositive.  (*In re Harper* (2022) 76 Cal.App.5th 450, 470.)  For the reasons outlined above, the *Clark* factors strongly supported the trial court's finding that Aramburo acted with reckless indifference to human life.

More to the point, Aramburo presented no evidence that, because of his youth, he failed to appreciate the grave risk to others posed by committing an armed carjacking and then fleeing in the car.  (Cf. *People v. Ramirez* (2021) 71 Cal.App.5th 970, 991 [that the defendant "was influenced by peer pressure" and "'was afraid'" of the consequences if he did not aid the shooter "may well have affected his calculation of the risk of death posed by using the firearm in the carjacking"].)  There is likewise no evidence in the record that Aramburo failed to appreciate the inherent risks posed by Ituarte's exceedingly dangerous driving, which Aramburo never tried to stop or minimize.  Every 17 year old understands the obvious danger that driving 100 miles per hour while weaving through traffic and running red lights poses.  (Cf. *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 595 ["every 18 year old understands bullet wounds require attention"].)  In fact, when an investigating officer told Aramburo shortly after the crash that he could be charged with murder if Garcia died (as she later did), he said, "Yeah I know."  This suggests that,

17

despite being 17 years old, Aramburo recognized the gravity of his actions, not that he "lacked '"the experience, perspective, and judgment"' to adequately appreciate the risk of death posed by his criminal activities."  (*In re Moore*, *supra*, 68 Cal.App.5th at p. 454.)

For the foregoing reasons, we conclude the trial court properly denied Aramburo's section 1172.6 petition.

## IV.

## DISPOSITION

The trial court's order denying Aramburo's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.

18